**TREEHOUSE LAW, LLP**
Joshua Nassir (SBN 318344)
Benjamin Heikali (SBN 307466)
Ruhandy Glezakos (SBN 307473)
Katherine Phillips (SBN 353048)
3130 Wilshire Blvd., Suite 555
Santa Monica, CA 90403
Telephone: (310) 751-5948
*jnassir@treehouselaw.com*
*bheikali@treehouselaw.com*
*rglezakos@treehouselaw.com*
*kphillips@treehouselaw.com*

*Attorneys for Plaintiff*
*and the Putative Class*

**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson (SBN 257074)
*rclarkson@clarksonlawfirm.com*
Bahar Sodaify (SBN 289730)
*bsodaify@clarksonlawfirm.com*
Alan Gudino (SBN 326738)
*agudino@clarksonlawfirm.com*
Samuel M. Gagnon (*pro hac vice*)
*sgagnon@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Fax: (213) 788-4070

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLBY TUNICK, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TAKARA SAKE USA INC.,<br><br>Defendant. | Case No.: 3:23-cv-00572-TSH<br>Compl. Filed: February 8, 2023<br>FAC Filed: April 26, 2023<br><br>*Assigned to Hon. Thomas S. Hixson, United States Magistrate Judge*<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVE, AND APPOINTMENT OF CLASS COUNSEL**<br><br>*[Declarations of Joshua Nassir and Colby Tunick filed in support]*<br><br>Date: March 6, 2025<br>Time: 10:00 a.m.<br>Courtroom: E – 15th Floor |

## REDACTED—PUBLICLY FILED

# TABLE OF CONTENTS

Page No.

I.  INTRODUCTION ........................................................................................................ 1

II. COMMON FACTS AND EVIDENCE SUPPORTING CLASS CERTIFICATION ........... 2

    A.  Defendant Uniformly and Prominently Labeled the Products with the Japanese
        Origin Representations Throughout the Class Period ................................................ 2

        1.  The Gold Emblem Stating "Licensed by TaKaRa Japan, Since 1851" ......... 2

        2.  The "Sho Chiku Bai" Japanese Brand Name .................................................. 3

        3.  Japanese Lettering – "Kanji" ........................................................................... 4

        4.  The Products' Labels Deceptively Imitate Real Japanese-Made Sake .......... 5

    B.  Defendant's Internal Documents Confirms Consumers' Preference for Japanese-
        Made Sake .............................................................................................................. 6

    C.  The Japanese Origin Representations Are False and Deceptive Because Neither the
        Products, Nor Their Primary Ingredients Are Made in Japan ................................... 7

    D.  Plaintiff's Market Research Expert Confirms Consumers Are Misled to Believe the
        Products Are Made in Japan Due to the Japanese Origin Representations ................ 7

III. LEGAL STANDARD ................................................................................................. 8

IV. ARGUMENT .............................................................................................................. 8

    A.  The Class Is Adequately Defined ............................................................................. 8

    B.  The Rule 23(a) Criteria Are Satisfied ..................................................................... 10

        1.  Numerosity ...................................................................................................... 10

        2.  Commonality .................................................................................................. 10

        3.  Typicality ........................................................................................................ 12

        4.  Adequacy ........................................................................................................ 13

V.  THE REQUIREMENTS OF RULE 23(B)(3) ARE SATISFIED ........................................ 15

    A.  Class Claims Will Be Resolved Through Objective Standards and Common
        Evidence That Apply Class-Wide ........................................................................... 16

        1.  California's Consumer Protection Laws ......................................................... 16

2.   Breach of Warranty ........................................................................ 19

3.   Unjust Enrichment ......................................................................... 20

B.   The Class's Damages Model Is Capable of Measuring Class-wide Damages and Is Consistent with the Class's Theory of Liability ........................................ 20

C.   Superiority ................................................................................................. 23

VI.   THE REQUIREMENTS OF RULE 23(B)(2) ARE SATISFIED ........................................ 24

VII.   CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page No.**

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ............................................................................... 8, 15

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
   568 U.S. 455 (2013) ..................................................................................... 17

*Armstrong v. Davis*,
   275 F.3d 849 (9th Cir. 2001) ....................................................................... 12

*Astiana v. Kashi Co.*,
   291 F.R.D. 493 (S.D. Cal. 2013) ........................................................ 9, 11, 20

*Bailey v. Rite Aid Corp.*,
   338 F.R.D. 390 (N.D. Cal. 2021) ................................................................. 21

*Beck-Ellman v. Kaz USA*,
   283 F.R.D. 558 (S.D. Cal. 2012) ................................................................. 13

*Bradach v. Pharmavite, LLC*,
   735 F. App'x. 251 (9th Cir. 2018) ............................................................... 17

*Briseno v. ConAgra Foods, Inc.*,
   844 F.3d 1121 (9th Cir. 2017) ....................................................................... 8

*Broomfield v. Craft Brew All., Inc.*,
   2018 WL 4952519 (N.D. Cal. Sept. 25, 2018) .............................. 11, 13, 24, 25

*Castro v. Paragon Indus., Inc.*,
   2020 WL 1984240 (E.D. Cal. Apr. 27, 2020) ............................................... 15

*Colgan v. Leatherman Tool Grp., Inc.*,
   135 Cal. App. 4th 663 (2006) ....................................................................... 20

*Davidson v. Kimberly-Clark Corp.*,
   889 F.3d 956 (9th Cir. 2018) ....................................................................... 25

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ....................................................................... 14

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011) ..................................................................................... 15

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
   326 F.R.D. 592 (N.D. Cal. 2018) ........................................................... 11, 21

*Forcellati v. Hyland's, Inc.*,
   2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) ............................................................. 9, 16

*Friend v. Hertz Corp.*,
   2011 WL 750741 (N.D. Cal. Feb. 24, 2011) .................................................................. 24

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982) ........................................................................................................ 12

*Hadley v. Kellogg Sales Co.*,
   324 F. Supp. 3d 1084 (N.D. Cal. 2018) ...................................................... 12, 17, 21

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ..................................................... 10, 12, 14, 15

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ........................................................................................ 13

*Harris v. Palm Springs Alpine Ests., Inc.*,
   329 F.2d 909 (9th Cir. 1964) .................................................................................... 8, 10

*Hinojos v. Kohl's Corp.*,
   718 F.3d 1098 (9th Cir. 2013) ..................................................................................... 16

*In re ConAgra Foods, Inc.*,
   302 F.R.D. 537 (C.D. Cal. 2014) ................................................................................ 12

*In re Emulex Corp. Sec. Litig.*,
   210 F.R.D. 717 (C.D. Cal. 2002) ................................................................................ 14

*In re MyFord Touch Consumer Litig.*,
   291 F. Supp. 3d 936 (N.D. Cal. 2018) ...................................................................... 23

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015) ....................................................................................... 14

*In re Scotts EZ Seed Litig.*,
   304 F.R.D. 397 (S.D.N.Y. 2015) ................................................................................ 19

*In re Tobacco II Cases*,
   46 Cal. 4th 298 (2009) .................................................................................................. 16

*Johns v. Bayer Corp.*,
   280 F.R.D. 551 (S.D. Cal. 2012) ........................................................................ 13, 18

*Johnson v. Cal.*,
   543 U.S. 499 (2005) ........................................................................................................ 12

*Jordan v. L.A. County*,
    669 F.2d 1311 (9th Cir. 1982) ........................................................................ 10

*Keegan v. Am. Honda Motor Co., Inc.*,
    284 F.R.D. 504 (C.D. Cal. 2012) .................................................................... 10

*Kumar v. Salov N. Am. Corp.*,
    2016 WL 3844334 (N.D. Cal. July 15, 2016) ........................................ 12, 17, 18

*Kwikset Corp. v. Superior Court*,
    246 P.3d 877 (Cal. 2011) ............................................................................... 18

*Lambert v. Nutraceutical Corp.*,
    870 F.3d 1170 (9th Cir. 2017) ....................................................................... 21

*Lilly v. Jamba Juice Co.*,
    308 F.R.D. 231 (N.D. Cal. 2014) .................................................................... 9

*Lytle v. Nutramax Lab'ys, Inc.*,
    2022 WL 1600047 (C.D. Cal. May 6, 2022) ................................................... 21

*Maldonado v. Apple, Inc*,
    No. 3:16-CV-04067-WHO,
    2021 WL 1947512 (N.D. Cal. May 14, 2021) ................................................. 23

*Martin v. Monsanto Co.*,
    2017 WL 1115167 (C.D. Cal. Mar. 24, 2017) ........................................... 16, 19

*Martinelli v. Johnson & Johnson*,
    No. 2:15-cv-01733-MCE-DB,
    2019 WL 1429653 (E.D. Cal. Mar. 29, 2019) ................................................ 23

*McCrary v. Elations Co., LLC*,
    2014 WL 1779243 (C.D. Cal. Jan. 13, 2014) ................................................... 9

*Milan v. Clif Bar & Co.*,
    340 F.R.D. 591 (N.D. Cal. 2021) ...........................................................*passim*

*Motors, Inc. v. Times Mirror Co.*,
    102 Cal. App. 3d 735 (1980) .......................................................................... 19

*Mueller v. Puritan's Pride, Inc.*,
    2021 WL 5494254 (N.D. Cal. Nov. 23, 2021) ................................................. 25

*Mullins v. Premier Nutrition*,
    2016 WL 1535057 (N.D. Cal. Apr. 15, 2016) ................................................. 17

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) ................................................................. 11

*Rush v. Nutrex Research, Inc.*,
   2012 WL 2196144 (N.D. Cal. June 13, 2012)........................................ 19

*Prescott v. Reckitt Benckiser LLC*,
   2022 WL 3018145 (N.D. Cal. July 29, 2022) ................................... 11, 21

*Rodman v. Safeway, Inc.*,
   2014 WL 988992 (N.D. Cal. Mar. 10, 2014) .......................................... 18

*Schneider v. Chipotle Mexican Grill, Inc.*,
   328 F.R.D. 520 (N.D. Cal. 2018) .......................................................... 15

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010) ................................................................................ 8

*Sinatro v. Barilla Am., Inc.*,
   No. 22-CV-03460-DMR,
   2024 WL 2750018 (N.D. Cal. May 28, 2024)......................................... 13

*Smith v. Keurig Green Mountain, Inc.*,
   2020 WL 5630051 (N.D. Cal. Sept. 21, 2020) ........................... 18, 20, 25

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ................................................................ 12

*Tait v. BSH Home Appliances Corp.*,
   289 F.R.D. 466 (C.D. Cal. 2012) .............................................. 16, 20, 24

*Testone v. Barlean's Organic Oils, LLC*,
   2021 WL 4438391 (S.D. Cal. Sept. 28, 2021).................................. 11, 18

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) .............................................................................. 15

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ................................................................ 24

*Velazquez v. GMAC Mortg. Corp.*,
   605 F. Supp. 2d 1049 (C.D. Cal. 2008).................................................. 19

*Wal-Mart Stores, Inc., v. Dukes*,
   564 U.S. 338 (2011) ........................................................................ 10, 11

*Whiteside v. Kimberly Clark Corp.*,
   108 F.4th 771 (9th Cir. 2024) ............................................................... 16

*Williams v. Gerber Prods. Co.*,
   552 F.3d 934 (9th Cir. 2008) ........................................................... 16, 19

*Wolph v. Acer Am. Corp.*,
   272 F.R.D. 477 (N.D. Cal. 2011) ............................................................ 8

*Young v. Neurobrands, LLC*,
   2020 WL 11762212 (N.D. Cal. Oct. 15, 2020) ........................... 10, 11, 25

*Zakaria v. Gerber*,
   2016 WL 6662723 (N.D. Cal. Mar. 23, 2016) ................................. *passim*

*Zakaria v. Gerber Prods. Co.*,
   755 Fed. App'x 623 (9th Cir. 2018) ...................................................... 21

**California Codes**

Cal. Bus. & Prof. Code § 17203 ................................................................ 20

Cal. Bus. & Prof. Code § 17535 ................................................................ 20

Cal. Civ. Code 1770(a)(4) ....................................................................... 17

Cal. Civ. Code 1780(a)(3) ....................................................................... 20

Cal. Com. Code § 2313(1)(a)-(b) .............................................................. 19

Cal. Com. Code § 2314(2)(f) .................................................................... 20

**Federal Statutes**

15 U.S.C. § 1125(a) ............................................................................... 18

Fed. R. Civ. P. 23 ............................................................................... 1, 8

Fed. R. Civ. P. 23(a)(1) ........................................................................ 10

Fed. R. Civ. P. 23(a)(2) .................................................................... 10, 15

Fed. R. Civ. P. 23(a)(3) ........................................................................ 12

Fed. R. Civ. P. 23(a)(4) .................................................................... 13, 14

Fed. R. Civ. P. 23(b)(2) ................................................................. 9, 24, 25

Fed. R. Civ. P. 23(b)(3) ................................................................. 8, 15, 24

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO CLASS CERTIFICATION

1

**TABLE OF REFERENCES**

| Abbreviation | Document | Declarant/Deponent/Expert |
|---|---|---|
| ECF 14 | The true and correct Product labels attested to by Declaration of Norihisa Fujiwara in Support of Defendant Takara Sake USA Inc.'s ("Defendant" or "Takara") Motion to Dismiss Complaint | President of Takara |
| ECF 18 | First Amended Class Action Complaint ("FAC") | Plaintiff Colby Tunick ("Plaintiff") |
| ECF 30 | Order granting in part and denying in part Defendant's Motion to Dismiss Plaintiff's FAC | Magistrate Judge Thomas S. Hixson |
| ECF 32 | Answer to FAC | Plaintiff |
| ECF 55 | Plaintiff's Notice of Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel | Plaintiff |
| Nassir Decl. | Declaration of Joshua Nassir in Support of Plaintiff's Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel | Plaintiff's Counsel |
| Nassir Decl., Ex. 1 | Takara's Responses and Objections to Plaintiff's Interrogatories, Set One, dated September 29, 2023 | Takara |
| Nassir Decl., Ex. 2 | Deposition Transcript of Takara's 30(b)(6) designee, Izumi Motai, dated May 30, 2024 | Takara's Senior Advisor of Marketing and Tasting Room |
| Nassir Decl., Ex. 3 | Deposition Transcript of Takara's 30(b)(6) designee, Shukuko Heinzen, dated June 14, 2024 | Takara's Marketing and Public Relations Manager and Order Desk Manager |
| Nassir Decl., Ex. 4 | Takara's Internal Market Research on Consumer Perception of Sake (produced by Takara as TS0000188-212) | Takara |

| Nassir Decl., Ex. 5 | Takara's Gold Emblem (produced by Takara as TS0014946) | Takara |
|---|---|---|
| Nassir Decl., Ex. 6 | Takara's Japanese-made sake compared to California-made sake (produced by Takara as TS0011313-11344) | Takara |
| Nassir Decl., Ex. 7 | Takara's Japanese-made sake compared to California-made sake (produced by Takara as TS0011263-11270) | Takara |
| Nassir Decl., Ex. 8 | Slideshow presented by Takara to sales managers at the 2021 Spring General Sales Meeting ("GSM") (produced by Takara as TS0020453-20504) | Takara |
| Nassir Decl., Ex. 9 | Strengths Weaknesses Opportunities Threats (SWOT) analysis conducted by Takara (produced by Takara as TS0019603-19615) | Takara |
| Nassir Decl., Ex. 10 | Slideshow presented to sales managers at the 2019 Spring GSM (produced by Takara as TS0021164-21208) | Takara |
| Nassir Decl., Ex. 11 | Takara's Responses to Plaintiff's Requests for Admissions, Set One, dated September 29, 2023 | Takara |
| Nassir Decl., Ex. 12 | 2020 Sake Presentation created by Takara (produced by Takara as TS0010494-10527) | Takara |
| Nassir Decl., Ex. 13 | Deposition Transcript of Takara's 30(b)(6) designee, Yutaka Eto, dated May 24, 2024 | Takara's Vice President and Director |
| Nassir Decl., Ex. 14 | California sales data for Products from February 3, 2019 to September 8, 2024, produced by Circana, Inc. | Circana, Inc. |
| Nassir Decl., Ex. 15 | California sales data for Products from January 5, 2020 to September 22, 2024, produced by Albertsons Companies, Inc. | Albertsons Companies, Inc. |
| Nassir Decl., Ex. 16 | Firm Resume of Treehouse Law, LLP | Plaintiff's Counsel |

| | | |
|---|---|---|
| Nassir Decl., Ex. 17 | Firm Resume of Clarkson Law Firm, P.C. | Plaintiff's Counsel |
| Tunick Decl. | Declaration of Plaintiff Colby Tunick | Plaintiff |
| Weir Decl. | Declaration of Colin B. Weir | Plaintiff's Economics Expert |
| Gaskin Decl. | Declaration of Steven P. Gaskin | Plaintiff's Survey Expert |
| Klein Decl. | Declaration of Robert L. Klein | Plaintiff's Market Research Expert |
| Boyd Decl. | Declaration of Dr. David Boyd | Plaintiff's Japanese Translation Expert |

## I.     <u>INTRODUCTION</u>

Defendant uniformly labels and markets its "Sho Chiku Bai" branded sake Products as if they were made in Japan, using a prominent gold emblem reading "Licensed by TaKaRa Japan, since 1851," the Japanese brand name, and bold Japanese lettering on every bottle ("Japanese Origin Representations"). Consumers like Plaintiff Colby Tunick ("Mr. Tunick") reasonably understand these representations to mean they are purchasing authentic, Japanese-made sake. Defendant openly acknowledges that marketing its sake Products as Japanese-made is a key strategy because consumers associate sake from Japan with superior quality due to its rich cultural and historical roots. The problem under consumer protection laws is the Products are not made in Japan or with ingredients sourced from there. Instead, they are made entirely in a factory in the United States.

As a result of this false origin scheme, Defendant is unfairly profiting from consumers like Mr. Tunick, who pay a premium for the Products falsely represented as being authentic sake made in Japan, while Defendant avoids the increased costs it would incur were the sake actually made in Japan as represented. Defendant also gains an unfair competitive advantage over all the other companies producing authentic sake in Japan for sale in the United States or who otherwise represent the origin of their sake products with honesty. The harm to consumers and competitors alike is precisely why California explicitly bans advertising that fails to accurately convey where a product is made. Mr. Tunick has engaged leading market research expert, Bob Klein, to demonstrate that a significant portion of consumers believe the Products are made in Japan based on their uniformly deceptive labeling. Mr. Tunick's survey expert, Steven P. Gaskin, will use a reliable and commonly accepted method to measure the price premium consumers paid as a result of Defendant's origin fraud and Mr. Tunick's economics expert, Colin B. Weir, will then calculate total damages to the Class in an equally well-accepted method.

This case is well-suited for class treatment under Rule 23 of the Federal Rules of Civil Procedure. The Class is sufficiently numerous, as demonstrated by the sales of the Products. Common legal and factual questions dominate over individual issues due to the Products' uniform Japanese Origin Representations. Typicality is satisfied because Mr. Tunick purchased the Products during the Class Period and detrimentally relied on the Japanese Origin Representations, reflecting

1   the experience of other Class Members. Class Counsel and Mr. Tunick are well-positioned to

2   represent the Class effectively, with no conflicts of interest and Class Counsel's history of

3   successfully litigating complex class actions, including securing class certifications in similar cases.

4   Furthermore, Defendant's deceptive practices impact the entire Class, making injunctive relief

5   applicable to all members. Mr. Tunick also proffers a generally accepted damages model capable of

6   measuring class wide damages that is consistent with the Class's theory of liability. These common

7   class-wide issues predominate over individual issues, and a class action is a superior method of

8   adjudicating this dispute. Accordingly, this motion should be granted.

9   **II.    COMMON FACTS AND EVIDENCE SUPPORTING CLASS CERTIFICATION**

10          **A.    Defendant Uniformly and Prominently Labeled the Products with the**

11                  **Japanese Origin Representations Throughout the Class Period**

12          During the Class Period,[1] Defendant uniformly labeled and sold the Products[2] to the Class[3]

13   with the Japanese Origin Representations: (1) a gold emblem on the front of the Products' bottle

14   which prominently states "Licensed by TaKaRa Japan, Since 1851;" (2) the "Sho Chiku Bai"

15   Japanese brand name; and (3) large Japanese lettering. ECF 18 ¶ 2; Nassir Decl., Ex. 1 (all Products

16   sold in CA during Class Period included Japanese Origin Representations); *Id.*, Ex. 2, 29:20-30:3

17   (Takara admits Products' front label consistent during Class Period) (Nigori 1.5L), 37:20-38:3

18   (Nigori 750 ml), 39:2-39:10 (Nigori 375 ml), 40:12-40:23 (Classic Junmai 1.5L), 46:7-46:15

19   (Classic Junmai 750 ml), 53:1-53:12 (Tokubetsu Junmai 1.8L), 57:23-59:5 (Tokubetsu Junmai 720

20   ml); Fujiwara Decl., ECF 14, Exs. C, D, G, H, I, J, K, L (Product labels during Class Period).

21          **1.    The Gold Emblem Stating "Licensed by TaKaRa Japan, Since 1851"**

22          Defendant prominently displays a gold emblem on the front labels of its Products that reads,

23   "Licensed by TaKaRa Japan, Since 1851," purposefully giving the impression of a long-standing,

---

[1] The "Class Period" is February 8, 2019, through the present. Not. Mot. Class Cert., ECF 55, ¶ 1.
[2] The "Products" are: (1) Sho Chiku Bai Nigori Unfiltered Sake (375 mL, 750 mL, and 1.5 L) ("Nigori"); (2) Sho Chiku Bai Classic Junmai, (750 mL, 1.5 L) ("Classic Junmai"); (3) Sho Chiku Bai Tokubetsu Junmai (300 mL, 720 mL, 1.8 L) ("Tokubetsu Junmai").
[3] The "Class" is defined as: "All persons who, during the Class Period, purchased one or more of the Products in California for purposes other than resale at a retail location or online." Not. Mot. Class Cert., ECF 55, ¶ 1.

authentic Japanese origin. Fujiwara Decl., ECF 14, Exs. C, D, G, H, I, J, K, L; Nassir Decl., Ex. 5. The use of this emblem misleads consumers into thinking the Products are made in Japan, when in fact they are produced entirely in the United States. Nassir Decl., Ex. 2, 68:10-69:1, 71:17-72:8-12, 74:24-75:11 (explaining the gold emblem is the Japanese parent company's brand); *Id*., Ex. 3, 31:19-31:20 ("Takara Sake USA only produces sake in the United States.").

The emblem is the most significant and impactful representation on the Products' labels designed to evoke a historical connection to Japan, conveying the misleading narrative that the Products are made in Japan. Nassir Decl., Ex. 4, at TS0000207; Boyd Decl., Ex. E (translating TS0000207) ███████████████████████████████████████████████████████████████████████ ███████████████████████ The emblem is prominently positioned on the front top of the Products' labels so it is the first feature presented and noticed by consumers. Nassir Decl., Ex. 5. Defendant further draws consumers' attention to the emblem by having it be "gold, shiny [] looking at [consumers]." Nassir Decl., Ex. 2, 70:17-20. The emblem intentionally mimics an official seal conveying a license from Japan to convince consumers the Products are authentic Japanese-made sake. *Id*. 72:14-73:4 (confirming "Licensed" on gold emblem refers to using the Japanese parent company's brand name). The emblem incorporates all features of the Japanese Origin Representations by stating the "Sho Chiku Bai" brand name and including traditional Japanese lettering to further convey that the Products are made in Japan. Nassir Decl., Ex. 5.

The emblem also misleads consumers by prominently displaying the Japanese parent company's founding date of "1851," despite Defendant's U.S. production beginning in 1983. Nassir Decl., Ex. 2, 69:15-69:22. By using the 1851 date, Defendant deliberately creates the false impression that the Products originate from Japan, exploiting the history and prestige associated with Japanese tradition. Defendant admits it chose the 1851 date to "refer to historical background" (*Id*. 73:5-14), intentionally obscuring the Products' true U.S. origin.

### 2.    The "Sho Chiku Bai" Japanese Brand Name

Defendant's use of the brand name "Sho Chiku Bai" reinforces the false belief that its Products are made in Japan. By adopting traditional Japanese lettering or "kanji," identical to the

branding of its Japanese parent company Takara Shuzo, Defendant deceives consumers into thinking they are purchasing authentic Japanese-made products. As confirmed by Takara's Senior Advisor of Marketing and Tasting Room, Izumi Motai, "Takara Shuzo in Japan adopted Sho Chiku Bai as a brand name," using both English and Japanese versions, while two vertical lines written in kanji on the Nigori product specifically signify "Sho Chiku Bai" and "Nigori." Nassir Decl., Ex. 2, 35:7-35:14; 34:14-35:1. Instead of creating distinct branding for the Products for the American market, Defendant intentionally chose to replicate the exact Japanese lettering and branding of its Japanese parent company, further misleading consumers about the Products' true origin. *Id*., 35:7-35:10 (before Defendant adopted Sho Chiku Bai as a brand name, Takara Shuzo, Defendant's Japanese parent company, used it as a brand name). Defendant's brand name—Sho (pine), Chiku (bamboo), and Bai (Japanese plum)—also embodies traditional Japanese symbols, further reinforcing the misrepresentation of the Products true origin. *Id*., 43:19-45:3 (these symbols are "traditional graphic elements [that] appear everywhere" in Japan). The Products mimic the branding of Japanese-made sake, leading consumers to associate them with the high quality and authenticity of genuine Japanese sake, when in fact they are lower quality and made in the U.S.. *Id*., Ex. 3, 33:15-33:20 ("[T]he sake produced in the United States compared to that sake produced in Japan by the Headquarters of our company, they are, completely, two different levels or quality of sake, completely.")

### 3.     Japanese Lettering – "Kanji"

Defendant's Products prominently display kanji, a fundamental component of the Japanese language, in "large, bolded black lettering" on the front labels. Nassir Decl., Ex. 2, 24:13-24:18; Fujiwara Decl., ECF 14, Exs. C, D, G, H, I, J, K, L. Defendant deliberately uses kanji to evoke Japanese authenticity and exploit consumer interest in Japanese culture, openly admitting that this strategy targets consumers' attraction to "Japanese culture and Japanese things." Nassir Decl., Ex. 2, 82:13-82:21, 83:9-83:20, 24:13-24:18. Indeed, Defendant's own study found that ███

████████████████████████████████████████████████

████████████████████████████████████" *Id*., Ex. 4, at TS0000204, Boyd Decl., at Ex. D (translating TS0000204).

//

**4.    The Products' Labels Deceptively Imitate Real Japanese-Made Sake**

Defendant intentionally designed the Product labels to evoke Japanese origin, admitting that it knows "consumers are more attracted to labeling that has Japanese elements." *See* Nassir Decl., Ex. 2, 82:2-82:22. Defendant's Product labeling imitates authentic Japanese-made sake, including its own Japan-produced products, to mislead consumers into believing the Products are made in Japan and to influence their purchasing decisions. *Id.*, 82:2-83:10 (admitting consumers are "more attracted to labeling that has Japanese elements" and that invoking those elements is "related to American consumers, those design judgments."); *see id.* Exs. 6, 7 (both Defendant's Japanese-made sake and California-made sake include Japanese lettering along with English text describing sake type). Defendant admits that it aims to "display the tradition of uniqueness of Japanese sake culture" with the labeling on the Products, despite not being made in Japan. *Id.*, Ex. 2, 96:11-96:16.

The Japanese Origin Representations are enough to mislead consumers that the Products are made in Japan. But Defendant took its false origin scheme even further by emblazing the Products with additional Japanese references to further trick consumers into believing the sake is Japanese-made. For example, Defendant provides the Tokubetsu Junmai's Product's rice polishing percentage in Japanese rather than English on the Product's front label. ECF 14, Exs. G, H, I; Nassir Decl., Ex. 2, 54:1-55:3. Rather than providing information in English, the primary language in the U.S. market, Defendant used Japanese because "many sake in Japan display it this way." *Id.*, 55:15-55:19. The Tokubetsu Junmai Products' front labels all also include Japanese lettering that translates to "prepared in the style of Gingo sake," "resource" or "rice" and "Homare Koji [] -it's name of fungus." *Id.*, 57:5-57:17. Defendant uses Japanese motifs on the Products that further communicate the Products are made in Japan. The Tokubetsu Junmai uses images of "old Japanese architecture" intended to depict a "traditional scene of a brewing house." *Id.*, 50:3-50:14. The Nigori Products feature a red box with Japanese text, "Junmai and it's just made of rice," which Defendant admitted did not need English translation since its purpose was to invoke a "traditional cut, style [of] painting" Japanese art "that makes it legitimate." *Id.*, 35:1-36:25. They also include cherry blossom imagery, one of Japan's most iconic flowers. *Id.*, 33:24-34:11. Defendant knows that consumers prefer Japanese-made sake and deliberately designed the Product labels to create this false impression.

**B.    Defendant's Internal Documents Confirms Consumers' Preference for Japanese-Made Sake**

Defendant's internal documents demonstrate a clear understanding of American consumers' preference for sake made in Japan, and its efforts to exploit this preference are well-documented. Its market research reveals that ███████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████ Nassir Decl., Ex. 4, at TS0000188; Boyd Decl., at Ex. B (translating TS0000188). Consumers expressed that ███████████████████ ████████████████████████████████████████████████ █████████████████████████" *Id*. They also want to ███████████████ ████████████████████████ further emphasizing the importance of authenticity. *Id*. Defendant has openly acknowledged that ████████████████████████ ████████████████████, reinforcing the false perception ███████████████ █████████ *See* Nassir Decl., Ex. 8, at TS0020474 (██████████████████ ████████████████████). Instead of promoting its U.S.-made Products honestly, Defendant has capitalized on consumers' desire for authentic Japanese-made sake by deceptively presenting its Products as if made in Japan.

Defendant reveals the ████████████████████████████████ ████████████████████████████████████████████████ Nassir Decl., Ex. 9, at TS0019605; Boyd Decl., Ex. L (translating TS0019605). Defendant exploited this opportunity at the expense of Plaintiff and consumers, using the perception that Japanese-made sake is superior to unfairly market its U.S.-made Products as Japanese-made. Defendant's goal, as expressed in internal documents, was ████████████████████████████████████████ ██████ through its branding and labeling. Nassir Decl., Ex. 10, at TS0021182; *Id*., Ex. 2, 96:11-96:16 (Defendant aims to promote Japanese sake culture via product labels).

//

//

//

**C.    The Japanese Origin Representations Are False and Deceptive Because Neither the Products, Nor Their Primary Ingredients Are Made in Japan**

None of the Products sold in California during the Class Period are made in Japan. *See* Nassir Decl., Ex. 11, Resp. to RFA Nos. 23-25, 27, 28, 30-32 (admitting each of the Products "was brewed and manufactured outside of Japan" during the Class Period); ECF 32, ¶ 4 ("Takara admits the [challenged] Products are made in California[.]"); Nassir Decl., Ex. 3, 31:19-31:20 ("Takara Sake USA only produces sake in the United States."). The Products' primary ingredients are also not from Japan. Sake contains a few primary ingredients, and ███████████████████ ███████████████." *See* Nassir Decl., Ex. 10, at TS0021183; *Id*., Ex. 12, at TS0010498 (sake ingredients are water, rice, koji, yeast, and (Climate)), TS0010499-500 (emphasizing importance of rice and water in sake). Yet, the rice and water in the Products come from America, not Japan. *See* Nassir Decl., Ex. 13, 57:6-57:12 ("[O]ur sakes are made using American rice and American water, of course."); *Id*., Ex. 11, Resp. to RFA Nos. 33-35, 37, 38, 40-42 (admitting the Products "contained one or more ingredients that were sourced outside of Japan" during the Class Period). The Products are not made in Japan nor are they made with any primary ingredients from Japan, rendering Defendant's Japanese Origin Representations false and deceptive.

**D.    Plaintiff's Market Research Expert Confirms Consumers Are Misled to Believe the Products Are Made in Japan Due to the Japanese Origin Representations**

Mr. Tunick and the Class relied on the Japanese Origin Representations when purchasing the Products, believing they were buying Japanese-made sake. Tunick Decl. ¶¶ 3, 4. To empirically assess how these representations influenced consumer beliefs, Mr. Tunick's market research expert, Bob Klein, conducted a survey using well-established survey methods. Klein Decl. ¶¶ 1-7, 13-21, Appendix A. In the survey, one group of California respondents ("Test Group") viewed Defendant's Sho Chiku Bai Nigori Unfiltered Sake 750ml label, while a control group saw a competitor's U.S.-made Eclipse sake without Japanese origin representations ("Control Group"). Mr. Klein found that 48.6% of the Test Group, exposed only to the front label, believed the product was made in Japan, with a 39.3% net deception rate. *Id.* ¶ 69. Additionally, when both front and back labels were reviewed, 34% of the Test Group versus 8.2% of the Control Group thought the Products were made

in Japan, resulting in a 25.8% net deception rate. *Id*. ¶ 67. Based on these results, Mr. Klein opined "to a reasonable degree of professional certainty, that a significant number of the relevant consumers are likely to be misled by the Products' labeling and believe that the Defendant's sake is made in Japan." *Id*. ¶ 13.

## III.    LEGAL STANDARD

Public policy strongly favors certification of consumer class actions like this one, with courts recognizing that consumer protection claims are ideal for class treatment and that any doubt as to the propriety of certification should be resolved in favor of certification. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997); *Harris v. Palm Springs Alpine Ests., Inc.*, 329 F.2d 909, 913 (9th Cir. 1964). Under Fed. R. Civ. P. 23, "'[a] class action may be maintained' if two conditions are met: The suit must satisfy the criteria set forth in subdivision (a) (i.e., numerosity, commonality, typicality, and adequacy of representation), and it also must fit into one of the three categories described in subdivision (b)." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). Rule 23(b)(2) permits the court to certify a class where the party against whom the relief is sought "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3) allows certification where common questions of law or fact predominate over individual ones and where "a class action is superior to other available methods." Fed. R. Civ. P. 23(b)(3). Pertinent factors in this determination include, (A) the class members' interests in individually controlling the action, (B) whether any litigation concerning the controversy has already begun, (C) the desirability of concentrating the litigation in the forum, and (D) the difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D). As discussed below, each requirement set forth under Rule 23(a), (b)(2), and (b)(3) is satisfied warranting certification of the Class.

## IV.    ARGUMENT

### A.    The Class Is Adequately Defined

While no ascertainability requirement exists under the Ninth Circuit, a class must still be adequately defined. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124, n.4 (9th Cir. 2017); *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D. Cal. 2011) ("The class definition must be

1    sufficiently definite so that it is administratively feasible to determine whether a particular person

2    is a class member."). A class is adequately defined where objective criteria can be applied to

3    determine eligibility as a class member. *Forcellati v. Hyland's, Inc.*, 2014 WL 1410264, at *5 (C.D.

4    Cal. Apr. 9, 2014). The Class is well-defined as: "All persons or entities who, during the Class

5    Period, purchased one or more of the Products in California for purposes other than resale." ECF 18

6    ¶ 62.

7        The Class is objectively and sufficiently definite. It "identifies purchasers of Defendant's

8    products that included the material misrepresentations. Because the alleged misrepresentations

9    appeared on the actual packages of the products purchased, there is no concern that the class includes

10   individuals who were not exposed to the misrepresentation." *Astiana v. Kashi Co*., 291 F.R.D. 493,

11   500 (S.D. Cal. 2013); *Forcellati*, 2014 WL 1410264, at *5 ("Here, Plaintiffs have precisely defined

12   their class based on an objective criterion: purchase of Defendants' . . . products within a prescribed

13   time frame. This is enough to satisfy Rule 23(a)'s implied ascertainability requirement.").

14       Moreover, "[t]here is no requirement that 'the identity of the class members . . . be known at

15   the time of certification.'" *Astiana*, 291 F.R.D. at 500. So long as the class definition is sufficiently

16   definite to identify putative members, as it is here, any "challenges entailed in the administration of

17   this class are not so burdensome as to defeat certification." *Id.*; *see also Lilly v. Jamba Juice Co.*,

18   308 F.R.D. 231, 238 (N.D. Cal. 2014) ("Few people retain receipts for low-priced goods . . . Yet it

19   is precisely in circumstances like these, where the injury to any individual consumer is small, but

20   the cumulative injury to consumers as a group is substantial, that the class action mechanism

21   provides one of its most important social benefits. In the absence of a class action, the injury would

22   go unredressed."). Here, Class Members can be identified based on objective criteria, such as the

23   product purchased and the date and location of purchase. Even without documentary proof, Class

24   Members may self-identify by declaring under oath that they purchased the Products. *See McCrary*

25   *v. Elations Co., LLC*, 2014 WL 1779243, at * 7 (C.D. Cal. Jan. 13, 2014).

26   //

27   //

28   //

1

**B.**     **The Rule 23(a) Criteria Are Satisfied**

2

**1.**     *Numerosity*

3

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is

4

impracticable[.]" Fed. R. Civ. P. 23(a)(1); *Harris*, 329 F.2d at 913-14. "Impracticability does not

5

mean impossibility," but rather asks the court to assess the difficulty or inconvenience of joining all

6

members of the class. *Harris*, 329 F.2d at 913-14. No cutoff number exists to determine numerosity,

7

but courts have consistently held that joinder is impracticable where the class is composed of more

8

than 40 persons. *Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504, 522 (C.D. Cal. 2012).

9

Numerosity is satisfied here because there were ███████████ of Products sold in California

10

between February 2019 to September 2024. Nassir Decl., Exs. 14, 15. Although the exact size of

11

the proposed class is unknown, numerosity is reasonably inferred based on ███████████

12

███ sold during the Class Period. *Milan v. Clif Bar & Co.*, 340 F.R.D. 591, 597 (N.D. Cal. 2021)

13

(numerosity satisfied where millions of units sold to proposed classes).

14

**2.**     *Commonality*

15

Commonality requires the existence of "questions of law or fact common to the class" and is

16

construed liberally and permissively. Fed. R. Civ. P. 23(a)(2); *Jordan v. L.A. County*, 669 F.2d 1311,

17

1320 (9th Cir. 1982); *Young v. Neurobrands, LLC*, 2020 WL 11762212, at *3 (N.D. Cal. Oct. 15,

18

2020). Notably, even "a single [common] question' will do." *Wal-Mart Stores, Inc., v. Dukes*, 564

19

U.S. 338, 359 (2011) (citation omitted). The class's "claims must depend upon a common contention

20

. . . [and] . . . must be of such a nature that it is capable of class-wide resolution—which means that

21

determination of its truth or falsity will resolve an issue that is central to the validity of each one of

22

the claims in one stroke." *Id*. As the Ninth Circuit explained: "All questions of fact and law need

23

not be common to satisfy the rule. The existence of shared legal issues with divergent factual

24

predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies

25

within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998), *overruled on*

26

*other grounds by Wal-Mart Stores, Inc.*, 564 U.S. at 338.

27

In false advertising cases, "variation among class members in their motivation for purchasing

28

the product, the factual circumstances behind their purchase, or the price that they paid does not

defeat the relatively 'minimal' showing required to establish commonality." *Astiana*, 291 F.R.D. at 502. In fact, "it is an error of law for a court to inquire into the motives of each individual class member at the class certification stage." *Testone v. Barlean's Organic Oils, LLC*, 2021 WL 4438391, at *4 (S.D. Cal. Sept. 28, 2021). And "[i]n determining whether the 'common question' prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is capable of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666–67 (9th Cir. 2022).

Importantly, "[i]n misbranding and false advertising cases, courts routinely find that commonality has been satisfied based on the question of whether the label would be deceptive to a reasonable consumer." *Young*, 2020 WL 11762212, at *4. For example, in *Broomfield v. Craft Brew All., Inc.*, 2018 WL 4952519, at *5 (N.D. Cal. Sept. 25, 2018), the court certified a class of purchasers misled as to a product's geographic origin, explaining "[n]umerous courts have recognized that a claim concerning alleged misrepresentations on packaging to which all consumers were exposed is sufficient to satisfy the commonality requirement because it raises the common question of whether the packaging would mislead a reasonable consumer." *See also Prescott v. Reckitt Benckiser LLC*, 2022 WL 3018145, at *4 (N.D. Cal. July 29, 2022) (commonality exists where, as here, all consumers exposed to the same false claim).

Mr. Tunick identified numerous common questions in his First Amended Complaint. *See* ECF 18 ¶ 67 (listing common questions). These questions satisfy commonality because an answer to these questions—for example, whether the Japanese Origin Representations deceive reasonable consumers to believe the Products are made in Japan—will resolve "in one stroke" an issue that is central to the validity of each Class Member's claims under California's consumer protection laws. *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 607-08 (N.D. Cal. 2018) "Plaintiffs argue that the common question is: 'was Defendant's 'Made From Real Ginger' label likely to deceive reasonably consumers?' In other consumer fraud cases in this district, courts have found similar common questions to be sufficient to satisfy commonality.") (citations omitted); *Wal-Mart Stores, Inc.*, 564 U.S. at 359 (a single common question is sufficient).

Notably, the common questions here will be resolved by application of the same facts because Mr. Tunick and Class Members all purchased and were exposed to the Products bearing the same Japanese Origin Misrepresentations. Tunick Decl. ¶ 3; *see supra* section II.A (uniform Product labeling during class period); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1099 (N.D. Cal. 2018) (citing *Zakaria v. Gerber*, 2016 WL 6662723, at *8 (N.D. Cal. Mar. 23, 2016)) ("courts have repeatedly recognized that '[w]here the alleged misrepresentation appears on the label or packaging of each item being sold, class-wide exposure to it may be inferred.'"); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 569 (C.D. Cal. 2014) ("Because all class members were exposed to the statement and purchased [the] products, there is 'a common core of salient facts.'"); *Kumar v. Salov N. Am. Corp.*, 2016 WL 3844334, at *4-5 (N.D. Cal. July 15, 2016) (finding "sufficient common questions of fact and law" when "[t]he central question here is whether [defendant's] labels were likely to deceive a reasonable consumer."); *Milan*, 340 F.R.D. at 598 (finding commonality where "the main liability question … is the same: were the challenged statements likely to mislead an objectively reasonable consumer."). The Japanese Origin Representations are featured front and center on every Product label throughout the Class Period, satisfying the commonality requirement.

### 3.    *Typicality*

Typicality and commonality are often considered together because they "tend to merge" and "serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157, n.13 (1982). Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3). In the Ninth Circuit, typicality is satisfied if "the unnamed class members have injuries similar to those of the named plaintiffs and the injuries result from the same, injurious course of conduct." *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001), *abrogated on other grounds by Johnson v. Cal.*, 543 U.S. 499 (2005). However, "[t]ypicality does not mean that the claims of the class representatives must be identical or substantially identical to those of absent class members." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Rather, they need only be "reasonably co-extensive with those of absent class members[.]" *Hanlon*, 150 F.3d at 1020. And

notably, "[t]ypicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (cleaned up).

Courts find typicality in cases where defendants utilize "sufficiently similar" labeling claims or omissions. *See, e.g.*, *Beck-Ellman v. Kaz USA*, 283 F.R.D. 558, 566 (S.D. Cal. 2012) (certifying claims on behalf of all models in "heating pad" product line where all "heating pads contain[ed] similar omission[s]" and were "sufficiently similar"). Thus, Mr. Tunick may represent all members of the Class, regardless of which Product variety he purchased. *In re TFT–LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 593 (N.D. Cal. Mar. 28, 2010) ("The typicality requirement does not mandate that the products purchased . . . must be the same as those of absent class members.").

Typicality, like commonality, is satisfied here because Mr. Tunick and the Class all purchased the Products bearing the same material and deceptive Japanese Origin Representations. Tunick Decl. ¶ 3; *see supra* section II.A. Mr. Tunick purchased the Product relying on the Japanese Origin Representations, believing that the Product was made in Japan. Tunick Decl. ¶¶ 3, 4. Based on the belief that the Product was made in Japan, he was willing to pay more for it. *Id.* at ¶ 6. No more is required to satisfy typicality. *See e.g.*, *Broomfield*, 2018 WL 4952519, at *5-6 (typicality satisfied where the "belief [that the products were made in Hawaii] was one reason they purchased the beer and that they were willing to pay more for the beer based on this belief, causing them injury"); *Sinatro v. Barilla Am., Inc.*, No. 22-CV-03460-DMR, 2024 WL 2750018, at *9 (N.D. Cal. May 28, 2024) ("Plaintiffs' claims are typical because they, like the putative class members, seek relief for buying products that they allege were falsely and misleadingly labeled. They contend that they reviewed and relied on the Challenged Representation in deciding to purchase the products, and that had they known the products were not made in Italy from ingredients sourced in Italy," it would have affected their purchasing decision, and thus, "The nature of their claims is thus typical of the putative class members' claims."); *Johns v. Bayer Corp.*, 280 F.R.D. 551, 557 (S.D. Cal. 2012) (typicality satisfied where plaintiffs and class exposed to same misrepresentations).

### 4.  *Adequacy*

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the

interests of the class." Fed. R. Civ. P. 23(a)(4). The Ninth Circuit has articulated two criteria for determining legal adequacy: (1) whether the named plaintiffs and their counsel have any conflicts of interest with other class members; and (2) whether they will prosecute the action vigorously on behalf of the class. *See Hanlon*, 150 F.3d at 1020; *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011). As to the latter, "[t]he relevant inquiry is whether the plaintiffs maintain a sufficient interest in, and nexus with, the class so as to ensure vigorous representation." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir. 2015). Both criteria favor certification here.

First, the interests of Mr. Tunick and Class Members are aligned and there are no conflicts of interest. *See* Tunick Decl. ¶ 8. Mr. Tunick purchased the Product, reasonably believing based on the Product's labeling that the sake was made in Japan. *Id.* ¶ 4. His individual and class claims arise from the same course of deceptive conduct and Mr. Tunick seeks remedies equally applicable and beneficial to the Class.

Second, Mr. Tunick has played an active role in this litigation, and he is prepared to continue doing so after class certification is granted, including by testifying at trial. *Id.* ¶ 9. Mr. Tunick has demonstrated his commitment to vigorously pursuing this action for the Class by staying abreast of case developments and responding to discovery. *Id.* Mr. Tunick also understands the nature of a class action and his duty to fairly and adequately represent the interests of the Class. *Id.*

Mr. Tunick's counsel are equally committed to pursuing this action on behalf of the Class' best interests and have no conflicts of interest. Nassir Decl. ¶ 4. When determining whether Class Counsel is adequate, "a court may examine the attorneys' professional qualifications, skill, experience, and resources. The court may also look at the attorneys' demonstrated performance in the suit itself." *In re Emulex Corp. Sec. Litig.*, 210 F.R.D. 717, 720 (C.D. Cal. 2002) (citation omitted). Mr. Tunick's counsel, Treehouse Law, LLP and Clarkson Law Firm, P.C., are well-respected firms with extensive experience in complex and class action litigation. Nassir Decl. ¶¶ 4, 5, Exs. 16, 17. Class Counsel also have the resources necessary to vigorously litigate this action. *Id.*

Throughout this litigation, Mr. Tunick and his counsel have diligently safeguarded the interests of the Class. They successfully opposed the majority of Defendant's motion to dismiss (ECF 30) and have gathered comprehensive class-wide evidence to support class certification. This

includes conducting a thorough pre-litigation investigation of Defendant's labeling and advertising, serving detailed written discovery, resolving disputes through extensive meet and confer efforts, and analyzing voluminous discovery responses, much of which were in Japanese. *Id*. ¶ 4. Additionally, they subpoenaed third-party records, engaged in mediation efforts, consulted with leading experts, deposed Defendant's Rule 30(b)(6) corporate representatives, and skillfully managed the day-to-day aspects of the litigation. *Id.* The adequacy requirement has been fully met.

## V.    THE REQUIREMENTS OF RULE 23(B)(3) ARE SATISFIED

Because common questions of law and fact lie at the core of this case, Rule 23(a)(2) is satisfied, triggering the (b)(3) analysis on whether these questions predominate over individual ones. *Hanlon*, 150 F.3d at 1022 ("In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between the common and individual issues."). Under Rule 23(b)(3), "[a] class action may be maintained if . . . the court finds that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to the other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Both requirements are satisfied here.

"The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453-4 (2016) (quoting *Amchem*, 521 U.S. at 623). Evaluating predominance "begins . . . with the elements of the underlying cause[s] of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis." *Hanlon*, 150 F.3d at 1022 (quotation omitted). "Class actions in which a defendant's uniform policies are challenged generally satisfy the predominance requirement of Rule 23(b)(3)." *Castro v. Paragon Indus., Inc.*, 2020 WL 1984240, at *10 (E.D. Cal. Apr. 27, 2020) (citations omitted). Thus, "[i]n cases alleging misrepresentation, common issues predominate when plaintiffs are exposed to [a] common set of representations about a product." *Schneider v. Chipotle Mexican Grill, Inc*., 328 F.R.D. 520, 539-40 (N.D. Cal. 2018) (cleaned up). That is precisely the case here.

A.    **Class Claims Will Be Resolved Through Objective Standards and Common Evidence That Apply Class-Wide**

1.    *California's Consumer Protection Laws*

Mr. Tunick's California consumer protection claims are subject to uniform resolution: "[f]or purposes of class certification, the UCL, FAL, and CLRA are materially indistinguishable." *Forcellati*, 2014 WL 1410264, at *9 ("[e]ach statute allows Plaintiffs to establish the required elements of reliance, causation, and damages by proving that Defendants made what a reasonable person would consider a material misrepresentation."). The determinations necessary to adjudicate the CLRA, FAL, and UCL are not made with regard to each class member, but under a single, objective, and common "reasonable consumer" standard. *Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 777 (9th Cir. 2024) (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008)). The "objective test renders claims under the UCL, FAL and CLRA ideal for class certification because they will not require the court to investigate class members' individual interaction with the product." *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012).

A plaintiff must prove actual reliance under the CLRA, but "reliance may be presumed as to the entire Class if [Defendant's] misrepresentations were material." *Martin v. Monsanto Co.*, 2017 WL 1115167, at *6 (C.D. Cal. Mar. 24, 2017); *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) ("[A] presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material."). Mr. Tunick attests that he read and relied on the Japanese Origin Representations, and understood it to mean the Products are made in Japan. Tunick Decl. ¶¶ 3-4; ECF 18 ¶ 15. The representations were important to Mr. Tunick in deciding to buy the Product, and had he known the truth, he would not have purchased the Product. Tunick Decl. ¶¶ 3-6.

"A representation is material . . . if a reasonable consumer would attach importance to it *or if* the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013). Critically here, materiality is subject to common proof because it is "judged according to an objective standard and so '[t]he alleged misrepresentations and

omissions, whether material or immaterial, would be so equally for all [consumers] composing the class.'" *Mullins v. Premier Nutrition*, 2016 WL 1535057, at *5 (N.D. Cal. Apr. 15, 2016) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 459 (2013)). As a result of this objective test, Mr. Tunick's "claims under the UCL, FAL, and CLRA [are] ideal for class certification because they will not require the court to investigate 'class members' individual interaction with the product.'" *Bradach v. Pharmavite, LLC*, 735 F. App'x. 251, 254-55 (9th Cir. 2018).

While Mr. Tunick does not need to prove materiality at certification (*see Hadley*, 324 F. Supp. 3d at 1115), there can be no reasonable dispute the Japanese Origin Representations are material to consumers. *See also Milan*, 340 F.R.D. at 599 ("Questions of materiality and reliance also do not defeat predominance."). The evidence shows Defendant knew the value of sake products made in Japan. *See*, *supra*, section II.B; *Kumar*, 2016 WL 3844334, at *8 ("Materiality can be shown by a third party's, or defendant's own, market research showing the importance of such representations to purchasers.") (collecting cases).

This is consistent with several studies showing not only that consumers attach real monetary value to country of origin claims generally (more than 50% of its price), but also that they favor sake products from Japan specifically—and are willing to pay more for them. *See* Weir Decl. ¶¶ 15-23 (product attributes, such as the Japanese Origin Representations, allow consumers to differentiate between otherwise similar products, with the goal of increasing sales and profits). This is why Defendant prominently and uniformly displayed the Japanese Origin Representations on the front packaging of each Product. *See supra* section II.A; *Kumar*, 2016 WL 3844334, at *8; *see Kwikset Corp. v. Superior Court*, 246 P.3d 877, 892 (Cal. 2011) ("Simply stated: labels matter. The marketing industry is based on the premise that labels matter, that consumers will choose one product over another similar product based on its label and various tangible and intangible qualities they may come to associate with a particular source.").

Moreover, the materiality of the Japanese Origin Representations is reflected in the law itself, as the California legislature and Congress have categorically and specifically prohibited advertising that misrepresents the geographic origin of a product. *See* Cal. Civ. Code 1770(a)(4) (categorizing

"deceptive representations or designations of geographic origin in connection with goods" as unlawful); Lanham Act, 15 U.S.C. § 1125(a) (making false designations of origin in packaging or advertising unlawful); *see, e.g.*, *Testone*, 2021 WL 4438391, at *13 ("the existence of . . . regulations prohibiting certain of the challenged statements on the Products' labels evidence materiality"); *Smith v. Keurig Green Mountain, Inc.*, 2020 WL 5630051, at *6 (N.D. Cal. Sept. 21, 2020) ("The California Supreme Court has found that statutory recognition of materiality is highly persuasive."). Because such "statutory recognition of materiality is highly persuasive," and false origin claims are specifically banned by California and Federal law, the Court should find it material.

Against this backdrop, it is no surprise that courts find origin claims material, without further need for proof from each individual consumer. *See, e.g.*, *Kumar*, 2016 WL 3844334, at *24-25 (finding olive oil "Imported from Italy" labeling claims material); *Kwikset Corp.*, 246 P.3d 877, 892 (finding "Made in the U.S.A." claims material). For consumers, "processes and places of origin matter" as they play a significant role in the authenticity and economic differences between products. *Kwikset Corp.*, 246 P.3d at 890.

Additionally, because each Class Member was exposed to the same Japanese Origin Representations, "the predominating common issues include whether [Defendant] misrepresented" the Products as authentic Japanese-made sake products, "and whether the misrepresentations were likely to deceive a reasonable consumer." *Johns*, 280 F.R.D. at 557. The answer to these objective questions will apply to the Class equally, such that their claims will rise or fall together. *Rodman v. Safeway, Inc.*, 2014 WL 988992, at *9 (N.D. Cal. Mar. 10, 2014) ("The scope and proper interpretation of the objective words of the parties' agreement is a common question that applies commonly to all members of the class, is an issue whose resolution will drive resolution of the litigation, and will predominate over any individualized issues.").

In any event, because materiality is judged on the objective, reasonable consumer standard, its determination is not only subject to common proof, but "is a question of fact to be determined at a later stage." *Johns*, 280 F.R.D. at 558-59. Therefore, materiality and reliance pose no hindrance to certification of the Class.

//

Common questions also predominate as to the "unfair", "unlawful", and "fraudulent" prongs of the UCL. Under the "unfair" prong of the UCL, "[t]he court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . ." *Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 740 (1980). Defendant's efforts to persuade consumers to purchase the Products, and the harm resulting from these purchases, are issues common to members of the Class. Deceiving consumers provides no utility. Similarly, under the "unlawful prong," unlawful business acts include "any practices forbidden by law[.]" *Rush v. Nutrex Research, Inc.*, 2012 WL 2196144, at *8 (N.D. Cal. June 13, 2012). Defendant's breaches of the FAL, CLRA, and other laws alleged herein are predicate violations supporting claims under the unlawful prong of the UCL. *See Velazquez v. GMAC Mortg. Corp.*, 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008). Finally, regarding the "fraudulent" prong, Plaintiff must establish that "members of the public are likely be deceived" by Defendant's misrepresentations, which is an objective test subject to common proof, as described above. *See Williams*, 552 F.3d at 938 (internal quotes omitted). Therefore, predominance is satisfied here for the UCL, FAL, and CLRA claims.

### 2.    *Breach of Warranty*

Mr. Tunick also seeks certification of his warranty claims, which require showing that "(1) the seller's statements constitute an affirmation of fact or promise or a description of the goods; (2) the statement was part of the basis of the bargain; and (3) the warranty was breached." *Zakaria*, 2016 WL 6662723, at *13; *see also* Cal. Com. Code § 2313(1)(a)-(b). Because each member of the Class was exposed to the misleading message that the Products are made in Japan, "[w]hether such [] statement[s] constitute[] an express warranty, [and] whether that warranty was breached. . . are issues subject to common and generalized proof." *Martin*, 2017 WL 1115167, at *7 (certifying warranty claims in consumer false labeling case). And "[b]ecause reliance is not an element of express warranty claims under California law, common questions predominate and class action treatment is appropriate." *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 411 (S.D.N.Y. 2015) (certifying class for breach of express warranty under California law). As established above, Defendant has implemented deceptive representations on all Products, a common course of conduct, which has deceived most consumers. *See supra* section II.C.

Mr. Tunick's implied warranty claims should also be certified. To be merchantable, goods must "[c]onform to the promises or affirmations of fact made on the container or label, if any." Cal. Com. Code § 2314(2)(f). Mr. Tunick and other members of the Class were misled by Defendant's representations that the Products are made in Japan and therefore did not receive goods that conformed to the promises or affirmations on the label. Because "[a]n implied warranty claim requires an objective standard, and is 'therefore susceptible to common proof' . . . '[c]ourts routinely certify implied warranty classes for this reason.'" *Zakaria*, 2016 WL 6662723 at *13 (quoting *Tait*, 289 F.R.D. at 485) (certifying class for breach of implied warranty under California law). There will be a "common, objective inquiry asking whether the challenged [Japanese Origin Representations] created warranties that were breached, and whether the [P]roducts failed to 'conform to the promises or affirmations of fact made on the container or label.'" *Milan*, 340 F.R.D. at 599 (certifying class-wide implied warranty claims in part because "exactly the same representations were made to all class members via product packaging").

### 3. *Unjust Enrichment*

Like the warranty claims, Mr. Tunick's unjust enrichment claim satisfies predominance. Unjust enrichment (or quasi contract) claims "require common proof of the defendant's conduct and raise the same legal issues for all class members." *Astiana*, 291 F.R.D. at 505 (citing cases); *see also Smith*, 2020 WL 5630051, at *5 ("[T]he Court finds the inquiry presented here— whether Keurig was unjustly enriched by the proposed class members' purchase of the Products given its allegedly false representations regarding recyclability—raises the same legal issues as to all class members. Accordingly, predominance is also met for the unjust enrichment claim.").

### B. The Class's Damages Model Is Capable of Measuring Class-wide Damages and Is Consistent with the Class's Theory of Liability

The UCL, FAL, and CLRA all authorize courts to grant restitution to private plaintiffs bringing claims under these statutes. As noted in *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 694 (2006), and supported by California law (Cal. Bus. & Prof. Code §§ 17203, 17535; Cal. Civ. Code § 1780(a)(3)), courts have the authority to provide such restitution.

//

"Class-wide damages calculations under the UCL, FAL, and CLRA are particularly forgiving. California law 'requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.'" *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1183 (9th Cir. 2017) (reversed on other grounds). In false advertising cases, courts have consistently recognized the "price premium" attributable to misrepresentations on product labeling as a valid measure of damages. *Hadley*, 324 F. Supp. 3d at 1104; *Prescott*, 2022 WL 3018145, at \*10.

Conjoint analysis is widely regarded as an effective method for isolating this price premium (*Hadley*, 324 F. Supp. 3d at 1107; *Lytle v. Nutramax Labs., Inc.*, 2022 WL 1600047, at \*17 (C.D. Cal. May 6, 2022)), and has been repeatedly upheld in cases involving class-wide damages calculations for mislabeling under the CLRA. *Milan*, 340 F.R.D. at 601; *Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 411 (N.D. Cal. 2021).

The Ninth Circuit has affirmed that "plaintiffs can measure class-wide damages using methods that evaluate what a consumer would have been willing to pay for the product had it been labeled accurately," as long as these methods "reflect supply-side considerations and marketplace realities that would affect product pricing." *Zakaria v. Gerber Prods. Co.*, 755 Fed. App'x 623, 624 (9th Cir. 2018). In mislabeling cases, courts have accepted conjoint analyses as sufficient for accounting for supply-side factors and estimating price premiums without conflicting with *Comcast*, provided that (1) the survey prices reflect actual market prices from the class period, and (2) the quantities used in the analysis correspond to actual quantities sold during that time. *Hadley*, 324 F. Supp. 3d at 1105. Additionally, courts have supported conjoint analyses that incorporate real market-clearing prices and fixed supply quantities. *Fitzhenry-Russell*, 326 F.R.D. at 606.

Mr. Tunick's damages model employs a comprehensive, multi-step approach. First, Mr. Klein's empirical survey confirms that a significant portion of consumers are misled by the Product labeling into believing that the Products are made in Japan. Klein Decl. ¶¶ 13, 70-73; *see supra* section II.D. Next, Mr. Gaskin's conjoint analysis is designed to later isolate and quantify the price premium associated with the language on the gold emblem ("Licensed by TaKaRa Japan, since 1851")—the Products' most prominent and significant Japanese Origin Representation. Gaskin

Decl. ¶ 9-10. Finally, Mr. Weir will calculate the price premium attributable to this representation, which "can then be multiplied by the number of units purchased by each class member to determine both total and individual damages." *Zakaria*, 2016 WL 6662723, at *16; Weir Decl. ¶¶ 8, 12-14, 24-35.

In *Milan*, the court specifically acknowledged the conjoint analysis developed by Mr. Tunick's expert, Mr. Gaskin, as a widely accepted method for determining price premium, deeming the plaintiff's damages model reliable and suitable for the case. 340 F.R.D. at 601. Similarly, in this case, the survey designed by Mr. Gaskin, along with the conjoint analysis he will conduct, isolates and quantifies the price premium linked to the gold emblem Japanese Origin Representation. This analysis will be instrumental in calculating the restitution and damages owed to the Class. *See* Gaskin Decl. ¶¶ 11-24 (outlining the conjoint survey's methodology, key steps, and the process for obtaining a representative sample of respondents).

Mr. Gaskin also identifies the critical labeling attributes included in the survey, such as brand, label claims, and price, explaining the rationale for their selection. *Id.* ¶¶ 25-30. His survey design adheres to established conjoint principles while factoring in supply-side considerations in both the survey and market simulation. *Id.* ¶¶ 10, 24. By incorporating real market prices and using actual product quantities sold (i.e., holding quantity constant), Mr. Gaskin's survey appropriately accounts for supply-side factors. *Id.* ¶ 24.

Mr. Gaskin will collaborate with Mr. Tunick's economist expert, Mr. Weir, who will offer economic expertise and evaluation for the conjoint survey. *See* Weir Decl. ¶¶ 8, 9, 12-14 (detailing his role in designing and assessing the economic validity of the conjoint survey, and providing a framework for calculating damages). Mr. Weir brings extensive experience in conducting conjoint analyses and calculating damages in consumer product cases. *Id.* ¶¶ 1-3, Ex. 1.

In this case, Mr. Weir will utilize Defendant's business records, third-party data, and industry resources to validate and supplement the conjoint survey findings. *Id.* ¶ 11-12, Ex. 2. Mr. Weir explains that a price premium can arise due to product differentiation—specific attributes, such as the gold emblem Japanese Origin Representation, allow consumers to distinguish between similar products in the marketplace. *Id.* ¶¶ 15-23. After reviewing documents from Defendant, Mr. Weir

identified that Defendant leverages this concept, with testimony confirming that "Defendant appears to understand that the Japanese Representations, including the Misrepresentation, constitute product attributes that will differentiate the Products, allowing Defendant to charge a premium for these attributes and derive higher revenues and profits therefrom." *Id.* ¶ 23; Ex. 2. As a result, Mr. Weir concludes that the Japanese Origin Representations, including the gold emblem, "would qualify as differentiating factors, with the potential impact to be tested empirically" in this case *Id.* ¶ 15. He emphasizes "[c]onjoint analysis can, and indeed has, been used to analyze the value and importance of product claims product claims" in similar matters. *Id.* ¶ 30.

Together, Mr. Gaskin and Mr. Weir will provide a reliable and rigorous method to measure the price premium for the Products' most prominent Japanese Origin Representation—the gold emblem—and will do so by accounting for supply side factors. *Id.* ¶¶ 47-50; *see Martinelli v. Johnson & Johnson*, No. 2:15-cv-01733-MCE-DB, 2019 WL 1429653, at *4 (E.D. Cal. Mar. 29, 2019) (declining to strike testimony of Mr. Weir where "the conjoint analysis . . . factored supply-side data into its design"); *see also Maldonado v. Apple, Inc*, No. 3:16-CV-04067-WHO, 2021 WL 1947512, at *22 (N.D. Cal. May 14, 2021) (stating that "this damages model—a conjoint analysis using real-world supply-side data—satisfies *Daubert* and California law."); *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 969-71 (N.D. Cal. 2018). And importantly, this price premium can be calculated without the need for "individualized analyses, or Class-member-specific inquiry," because "[a]ll relevant data needed to complete the conjoint analysis is class-wide, common evidence." Weir Decl. ¶ 35. Once the conjoint analysis reveals the price premia attributable to the gold emblem Japanese Origin Representation, those premia can be multiplied by the total units purchased by each class member, thus determining total and individual damages. *Zakaria*, 2016 WL 6662723, at *16; *see* Weir Decl. ¶¶ 65-68. Thus, Mr. Tunick's damages model is consistent with the Class's theory of liability and is capable of measuring class-wide damages in accordance with the law, further demonstrating predominance.

## C.    Superiority

Whether "a class action is superior . . . for fairly and efficiently adjudicating the controversy" depends on "(A) the class members' interests in individually controlling the prosecution or defense

of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). All four factors favor certification here.

Superiority is satisfied here. The Products are relatively inexpensive, and Class Members thus have no interest in controlling individual actions. *Tait*, 289 F.R.D. at 486 (Superiority "is met '[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis.'") (quotation omitted). Mr. Tunick's counsel is also unaware of any other related litigation. Nassir Decl. ¶ 6. Finally, this case focuses not on every consumer's interactions with the Products but instead on Defendant's uniform labeling practices. This minimizes any manageability concerns, which in any event cannot defeat class certification where, as here, "no realistic alternative exists." *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234-35 (9th Cir. 1996). Thus, a class action is the superior method.

## VI.    THE REQUIREMENTS OF RULE 23(B)(2) ARE SATISFIED

Under Rule 23(b)(2), a class action is appropriate if Rule 23(a) is met and "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive or declaratory relief is appropriate for the class as a whole" (Fed. R. Civ. P. 23(b)(2)). To certify under this rule, plaintiffs must have standing to seek injunctive relief for the class, which Mr. Tunick has. *Friend v. Hertz Corp.*, 2011 WL 750741, at *4 (N.D. Cal. Feb. 24, 2011).

First, Mr. Tunick has standing to pursue injunctive relief. Mr. Tunick attested that he relied on the Japanese Origin Representations when purchasing the Product and would buy it again if the misrepresentation were corrected. Tunick Decl. ¶¶ 3-5. However, Mr. Tunick cannot currently rely with confidence on Defendant's representations regarding where the sake is made now or where it will be made in the future. *Id.* ¶ 5. Thus, a Rule 23(b)(2) class is appropriate here. *Broomfield*, 2018 WL 4952519, at *8 (N.D. Cal. Sept. 25, 2018) (certifying a Rule 23(b)(2) class where plaintiffs "have stated that they would purchase Kona Beers made by CBA if they were actually brewed in Hawaii [and] [t]hey have also stated that they cannot buy Kona Beers with confidence that the beers are actually brewed in Hawaii while CBA continues to use the current alleged misrepresentations");

*see also Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969–70 (9th Cir. 2018) (finding that "previously deceived consumer[s]" may be under a "threat of future harm" when they are unable to rely on a product's labeling in the future and do not purchase the products as a result, despite desiring to do so). Like in *Broomfield* and *Davidson*, Mr. Tunick's injury can be rectified by an injunction prohibiting Defendant from making the deceptive representations as described herein.

Second, Mr. Tunick alleges that Defendant engaged in uniform deceptive practices affecting the entire Class. ECF 18 ¶¶ 36-38. Certification is appropriate when a defendant's conduct applies to the class generally, supporting injunctive relief (Fed. R. Civ. Proc. 23(b)(2); *Mueller v. Puritan's Pride, Inc.*, 2021 WL 5494254, at *8 (N.D. Cal. Nov. 23, 2021)). He claims Defendant's deceptively labeled Products mislead consumers into believing they are made in Japan. ECF 18 ¶¶ 47, 48.

Third, Mr. Tunick seeks injunctive relief to stop Defendant from continuing their deceptive labeling practices. *Id.* ¶¶ 16, 61. Such relief would benefit the Class by preventing further consumer deception. *Smith*, 2020 WL 5630051, at *11; *Young*, 2020 WL 11762212, at *7. The requirements of Rule 23(b)(2) are therefore satisfied.

## VII.    CONCLUSION

For the foregoing reasons, Mr. Tunick respectfully requests that the Court certify the proposed Class, designate Mr. Tunick as Class representative, and appoint Treehouse Law, LLP and Clarkson Law Firm, P.C. as Class Counsel.

DATED: October 17, 2024

**TREEHOUSE LAW, LLP**

By: */s/ Joshua Nassir*
    Joshua Nassir
    Benjamin Heikali
    Ruhandy Glezakos
    Katherine Phillips

**CLARKSON LAW FIRM, P.C.**

By: */s/ Bahar Sodaify*
    Ryan J. Clarkson
    Bahar Sodaify
    Alan Gudino
    Samuel M. Gagnon

*Attorneys for Plaintiff and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that on October 17, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.


Dated: October 17, 2024      By: _/s/ Bahar Sodaify_
              Bahar Sodaify